P. BEIERSDORF & CO., INC. v. UNITED STATES (No. 4434)[1]

1 C. A. D. 267.

United States Court of Customs and Patent Appeals, February 7, 1944

*Eugene R. Pickrell* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon* and *Richard F. Weeks*, special attorneys, of counsel) for the United States.

[Oral argument December 7, 1943, by Mr. Pickrell and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The First Division of the United States Customs Court sustained the classification of the collector, holding that appellant's imported merchandise here in controversy was properly dutiable at 25 per centum ad valorem under paragraph 37 of the Tariff Act of 1930 as an ester and at the rate of 3 cents per pound under section 701 (8) of the Revenue Act of 1936 as an inedible animal grease or fatty acid derived from inedible grease, processed. The importer there claimed that the merchandise was free of duty as an animal wax, not specially provided for, under paragraph 1796 (relying principally on this claim), or as a manufacture of wax, not specially provided for, at 20 per centum ad valorem under paragraph 1536, and that it was not subject to the internal·revenue tax. From the judgment of the United States Customs Court, appellant has here appealed.

The pertinent provisions of the tariff act and the revenue act involved are as follows:

PAR. 37. * * * esters of all kinds not specially provided for, 25 per centum ad valorem: * * *.

PAR. 1536. Candles, 27½ per centum ad valorem; manufactures of amber, bladders, or wax, or of which these substances or any of them is the component material of chief value, not specially provided for, 20 per centum ad valorem.

PAR. 1796. Wax: Animal, vegetable, or mineral, not specially provided for.

Sec. 701 of the Revenue Act of 1936.

*        *        *        *        *        *        *

(8) Whale oil (except sperm oil), fish oil (except cod oil, cod-liver oil, and halibut-liver oil), marine-animal oil, tallow, inedible animal oils, inedible animal fats, inedible animal greases, fatty acids derived from any of the foregoing, and salts of any of the foregoing; all the foregoing, whether or not refined, sulphonated, sulphated, hydrogenated, or otherwise processed, 3 cents per pound; * * *.

The manner in which the involved merchandise is produced is as follows: Wool grease or lanolin (which is a purified wool grease) is distilled or saponified to obtain wool grease fatty acids. These fatty acids are heated together with glycerine, which is of animal origin, in a process known as esterification. The product then becomes a glycerine ester of wool grease fatty acid. After cooling, it is skimmed off the glycerine and boiled in a charcoal solution to purify it, and it is then evaporated. The product at bar remains.

Exhibit 1, which is a sample of the imported merchandise, consists of a chunk of waxy material approximately 2½ inches square, contained in a tin receptacle which appears to be about a 1-pound tin. The waxy material remains in the approximately square form, notwithstanding the fact that it is supported at no point, except on the bottom, by any portion of the container; and, from our observation, it does not run or melt at room temperature.

The analyses of the imported merchandise according to both appellant's and appellee's witnesses differ materially only in the unsaponifiable matter. We quote the following table from the decision below:

|  | Plaintiff | Defendant |
|---|---|---|
| Melting Point | 58°–59° C | 58° |
| Specific Gravity | .969 | No Determination |
| Acid Value | 3–3.9 | 3.9 |
| Ester Value | 121–124 | 124 |
| Saponification Value | 124–127.9 | 127.9 |
| Iodine Value | 16.3–18.8 | 18.8 |
| Unsaponifiable Matter | 2.1 percent | 22.1 percent |

The importer took the testimony of two witnesses and the Government that of one. There was considerable conflict between the testimony of appellant's two witnesses and that of the witness for the Government especially as to their conclusions as to whether or not the importation was a wax. Dr. Harvey Seil, a chemist of wide experience who testified for the importer, in stating that exhibit 1 was a wax, said:

Q. Why is it a wax?—A. It is a wax because it has the general appearance of a wax, it possesses all the typical qualities, and has about the same specific gravity as the typical beeswax, its melting point is close to that of beeswax, which runs between 52 and 55, and its melting point is 58 to 59. It has a relatively low saponification value; its iodine value is low, and the fatty acids are very high in molecular weight.

Q. Can you express an opinion as to what kind of a wax it is?—A. Yes.

Q. What kind of wax is it?—A. It is a wax derived from lanolin.

Q. Would you consider it to be an animal wax?—A. Yes.

Q. Is or is not exhibit 1 an ester?—A. Yes, it is an ester.

Q. What kind of ester is it?—A. It is an ester of a high molecular weight fatty acid.

Q. Is it a glyceryl ester of a high molecular weight fatty acid?—A. I didn't make the specific test for the test of glycerine.

Q. How does exhibit 1 compare with beeswax?

A. It has the general appearance of beeswax, although slightly more tacky.

Q. What about the melting point and specific gravity?

A. The melting point is very close to that of beeswax—within five degrees. The specific gravity is within the beeswax range.

Q. Are you familiar with inedible animal greases?

A. Yes, to a certain extent.

Q. How are you familiar with them?—A. By having analyzed them.

Q. Can you express an opinion as to whether or not exhibit 1 is an inedible animal grease?—Yes or no.

A. Yes.

Q. And what is that opinion?—A. My opinion is that it is not an inedible animal grease.

Q. Why not?—A. Because the melting point is too high.

Q. Any other reason?—Its physical appearance?

A. Yes; the consistency is different from that of an animal grease. Animal greases are softer.

Dr. Seil also stated positively that esterification of a fatty acid differs from refining, sulphonating, sulphating, or hydrogenating fatty acids in that these processes "still leave you fatty acids," while the process of esterification of fatty acids results in their neutralization "by the alkali group of the glycerine."

The Government's witness, Dr. Bartlett, a Government chemist, stated that the imported merchandise was not an animal wax; and, as we construe his testimony, his conclusion was based for the most part upon a statement which he made to the effect that he did not know of any animal wax that was a glyceride. He later admitted, however, that many well-known waxes, such as myrtle and Japan, both vegetable waxes, were glycerides. He further stated that the importation at bar is a "different product from wool grease. It is made from wool grease, but it is a different product entirely." Another reason why he regarded it as not being a wax was that exhibit 1 was more greasy and of a more unctuous consistency than a wax. He stated that in natural wool grease fatty acids are combined with cholesterol. He was also of the opinion that when a fatty acid is esterified, the result is a product wholly different from that produced by such processes as sulphonation, sulphation, hydrogenation, or chlorination. He agreed with the other witnesses that, chemically, wool grease is a wax.

It is too well settled to require extended citation that Congress speaks in the language of commerce. Where there is no difference between the commercial and common meanings, the accepted common meaning shall govern. If the scientific meaning and the common meaning differ, it is presumed that Congress used the term in its common sense, unless it is made to appear otherwise. Much of the testimony of both parties goes to the question of the technical chemical meaning of the term "wax" and some of the testimony of both parties relates to the common meaning of the term.

"Wax" is variously defined by the lexicographers, from a few of which we quote. Funk & Wagnalls New Standard Dictionary, 1942, refers to "wax" as a "beeswax" and also as "Any of several substances of wax-like appearance and consistency. Specif.: (1) *Chem.* Any wax-forming ester." This indicates that the term "wax" has a common meaning differing somewhat from its scientific meaning. Further we find in the same authority the following:

The *waxes* are distinguished from the fats in that they consist of esters of monohydric alcohols with high molecular weight, whereas the fats are an ester of the trihydric alcohol, glycerol. Spermaceti belongs to the wax variety.

In the Century Dictionary and Cyclopedia, Vol. X, it is stated that "wax" is—

One of various substances and products resembling beeswax in appearance, consistency, plasticity, and the like, or used for like purposes. * * *.

Vegetable waxes are there enumerated as "Chinese wax, cow-tree wax, carnauba wax, and Japan wax." Mineral wax is referred to as "A mineral product, one of certain fossil hydrocarbons which occur in small quantities generally in the Carboniferous formation." Attention is also called to "A thick resinous substance, consisting of pitch, resin, and tallow, used by shoemakers for rubbing their thread."

In order to arrive at the intent of Congress in using the term "Wax: Animal, vegetable, or mineral," we think it important to consider the manner in which Congress has treated this subject throughout the years of our tariff history. Beeswax, from the passage of the Tariff Act of 1890 to the act of 1922, was eo nomine provided for in the free list. (Bleached beeswax was made dutiable in the 1922 and 1930 acts.) Also, during all the intervening years to and including the passage of the act under consideration here, vegetable and mineral waxes have been in the free list. No mention of animal wax is found in any of the tariff acts prior to the Tariff Act of 1922. Prior to the passage of that act there had been considerable litigation involving the question of whether certain waxes, such as Chinese wax, should be regarded as of animal or vegetable origin, and much doubt on the question resulted. In *Walsh* v. *United States*, T. D. 25212, 7 Treas. Dec. 620, Chinese wax was held to be a vegetable wax, although the court recognized that the authorities were much in dispute as to whether or not this wax produced from the sap of a tree by the action of an insect was in fact of animal origin.

The Government argues in this court that wax, within the meaning of the tariff provision and as defined by the lexicographers, must be a "natural product and not the result of a chemical process." In this connection it is significant to note that while the Tariff Act of 1909 was under consideration a volume entitled "Notes on Tariff Revision" was prepared under the direction of the clerk of the committee for the use of the Committee on Ways and Means of the House of Representatives (H. R. Doc. 1503, 60th Cong., 2d Sess.) in which the following is found at page 812:

In G. A. 6609 (T. D. 28220, May 31, 1907) carnauba wax, which it appears is made by bleaching wax from carnauba palms with paraffin, was held to be free of duty as vegetable wax. On appeal this decision was affirmed in the case of United States *v.* Morningstar, reported in T. D. 29121, *the court finding that paragraph 695 is not limited to natural wax.* The Government's appeal from this affirmance is now pending in the circuit court of appeals. [Italics ours.]

The Circuit Court of Appeals of the Second Circuit, in *United States* v. *Charles Morningstar & Co.*, 168 Fed. 541 (1909), quoted the

entire opinion of the circuit court above referred to, concurred in the conclusion reached by the Board of General Appraisers (now the United States Customs Court) and the circuit court, affirmed its decision, and said:

* * *. Evidently Congress used the words "mineral wax" in their popular sense; otherwise, they would cover nothing. The article in question is compounded of carnauba wax and paraffin, and when completed is to all appearance a waxy substance, *used for the same purpose as are other waxes*, and containing no animal wax. * * *. [Italics ours.]

Also, it may be noted that when the Tariff Act of 1913 was under consideration, a volume entitled "Abstract of Treasury Decisions under the Tariff Act of 1909" was prepared for the use of the Committee on Ways and Means of the House of Representatives. In this volume the attention of the committee was again called to the *Morningstar* case, *supra*, and the holding of the Circuit Court of Appeals. It will be recalled that the original holding of the Board of General Appraisers (now the United States Customs Court), which had been approved by the circuit court and the Circuit Court of Appeals, was that the provision in controversy was not limited to natural waxes.

Subsequently, in the Tariff Act of 1922, Congress for the first time placed the term "Wax: Animal, vegetable, or mineral" among the free-list provisions.

It may be added that in a comparatively recent case, *Strohmeyer & Arpe Co.* v. *United States*, 78 Treas. Dec. Adv. Sheets, No. 47, May 20, 1943, C. D. 764, the First Division of the United States Customs Court distinguished the facts in the *Morningstar* case from the facts involved there by pointing out that in the *Morningstar* case there was very little paraffin or mineral wax and expressed disagreement with the conclusion reached in the *Morningstar* case. Our only purpose in citing that case is upon the question raised by the Government that only natural waxes were intended by Congress to be covered by the free-list wax paragraph. The *Strohmeyer* case did not turn on that point. Unquestionably, paraffin is a mineral wax, although it is not a natural wax in the sense that beeswax is a natural wax.

In the Summary of Tariff Information, 1920, which was prepared for the Committee on Ways and Means of the House of Representatives when the Tariff Act of 1922 was under consideration, attention was called to the fact that "Chinese or insect wax is an animal rather than a vegetable or mineral product." At page 807 we find the following:

* * *. The *waxes* of this paragraph are substances which resemble beeswax (par. 412) in physical properties and are mixtures of compounds containing carbon, hydrogen, and oxygen. Vegetable waxes are obtained from the fruit, leaves, or stems of many plants, a small number only being of commercial value. The principal vegetable waxes are carnauba, candelilla, Japan, myrtle or bayberry, and Cochin China or cay-cav. Chinese or insect wax, though classed as a vege-

table, is really an animal wax. The mineral waxes, similar to paraffin (par. 561), come from natural bituminous substances; the most important are ceresin and montan.

In the Summary of Tariff Information, 1929, Vol. 2, pp. 2636–2637, we find the following:

\* \* \*. Beeswax is described under paragraph 1458 which provides for white bleached beeswax. The crude beeswax enters under paragraph 1693. The waxes of this paragraph are substances which in physical properties resemble beeswax and are mixtures of compounds containing carbon, hydrogen, and oxygen. Vegetable waxes are obtained from the fruit, leaves, or stems of many plants, a small number only being of commercial value. The principal vegetable waxes are carnauba, candelilla, Japan wax, myrtle or bayberry, and Cochin China or cay-cay. Chinese or insect wax, though classed as vegetable, is really an animal wax. The mineral waxes, similar to paraffin (par. 1633), come from natural bituminous substances; the most important are ceresin and montan.

We find nothing in the quoted language used by the Tariff Commission that would suggest that Congress in passing the Tariff Act of 1922 and its subsequent enactment of the same provision in the Tariff Act of 1930 did not intend for all animal waxes to be included within the term "Wax: Animal, vegetable, or mineral." The Tariff Commission in the above quotations told Congress that the waxes to be included in that provision were those "which in physical properties resemble beeswax and are mixtures of compounds containing carbon, hydrogen, and oxygen." It is our view that the imported merchandise falls within this definition.

Admittedly, if the instant importation is a wax it is an animal wax; and the best-known product, according to everyone concerned, with which it may be compared is beeswax. It seems obvious, however, that for it to be a wax it need not be identical with beeswax, but it should have a similarity in those characteristics and uses which would bring it into the same category. The instant wax is used in the manufacture of skin emulsions and lotions. According to the testimony and to recognized authorities, beeswax is also used for the same purpose. See Snell, "Chemicals of Commerce," p. 320. Contrary to the holding of the court below, we think that the instant merchandise falls squarely within the definition of wax as given by the lexicographers. It does not liquefy as readily as most greases. It is neutral in smell and taste. For the most part, it has a color similar to that of beeswax. It feels like wax and is not unctuous like grease.

On this phase of the case it is not contended by the Government that the instant merchandise is wool grease, although it does contend that it is an "inedible animal grease, processed" for the purpose of responding to the internal revenue provision in controversy. The Government states, in connection with its contention that the material is not a wax, that the imported merchandise is an ester of fatty acids derived from animal grease. That it is an ester derived from animal grease

involving the process of esterification is not disputed by the appellant. It seems clear to us that the instant importation, in view of the processes to which it has been subjected and the fact that it results in an ester of a fatty acid derived from wool grease, is more than wool grease or a fatty acid derived therefrom and has become what, in the common understanding as well as the scientific understanding, is a wool wax, which term is found in substantially all the authorities dealing with the question. See Lewkowitsch, "Chemical Technology and Analysis of Oils, Fats, and Waxes," Vol. II, pp. 744, 756; Wright and Mitchell, "Oils, Fats, Waxes, and their Manufactured Products," p. 614.

The instant material is not of the character that was involved in this court's decision in *Hummel Chemical Co.* v. *United States*, 29 C. C. P. A. (Customs) 178, C. A. D. 189. In that instance, the merchandise imported was wool grease, which contained more than 2 per centum of free fatty acids. That it was a wool grease for purposes of tariff classification was not contested by the importer in that case. The issue there was whether the importation was an inedible animal grease or whether it was an animal wax for purposes of internal revenue tax. Expert chemists there testified that even a wool grease, in a chemical sense, was a wax. This court said that it did not make any difference what the chemical meaning was if, in the common meaning, it was a grease and held that it was a grease within the internal revenue provision for inedible animal greases.

The instant merchandise admittedly has been processed far beyond the state of that which is ordinarily understood as being wool grease. In the first place wool grease is made into lanolin, which is stated to be still an inedible animal grease. In the instant process lanolin is distilled or saponified under pressure, and the resulting products are the fatty acids. Regardless of whether it is distilled or saponified, the result is the same except as to its content of unsaponifiable matter. The fatty acids thus obtained are heated together with glycerine in a process of esterfication. It then becomes an ester. The product is skimmed off the glycerine and is then purified by boiling with charcoal in solution. The solution is evaporated and the imported merchandise is left. It is a glyceryl ester of wool-fat acids and is in the form of a wax—a condition wholly different from that in which it was when it responded to the term wool grease.

As showing that there is a distinction between wool grease and esters of fatty acids derived therefrom, the following authorities seem pertinent. Thorpe's "Dictionary of Applied Chemistry," Vol. VII, p. 434, under the heading of "Waxes, Animal and Vegetable," states:

These waxes are a group of substances resembling beeswax in their physical properties; they are mixtures of compounds composed of the elements carbon, hydrogen, and oxygen. Waxes of mineral origin, such as paraffin wax, ozokerite, ceresin, and montan wax, are described elsewhere. Physically the waxes come

in the series (1) fixed oils, (2) soft fats, (3) tallow-like substances and solid fats, (4) waxes, and (5) resins. The waxes all melt below 100°. The waxes differ from the fats in having little or no greasiness at ordinary temperatures. The greasiness of most of the fats is probably due to their containing some olein (glyceryl oleate) or some glyceryl esters of unsaturated fatty acids. * * *.

*       *       *       *       *       *       *

The chief proximate components of the waxes are: (1) esters of the fatty acids with alcohols containing a high number of carbon atoms; (2) esters of fatty acids with glycerol; (3) free fatty acids; (4) free alcohols containing a high number of carbon atoms; (5) hydrocarbons. * * *.

The waxes, like most natural products, are mixtures of several components, and the isolation of these is a difficult and lengthy task, which has been attempted by comparatively few investigators. In consequence of this and *in order to meet the requirements of commerce, it is customary when examining samples of the waxes to determine what may be called their analytical values, and from the results to infer their quality and freedom from adulterations.* These values are also called the character-istics *of the waxes;* they have been much studied and include the physical deter-minations of specific gravity, melting point and sometimes refractive index, and also certain chemical determinations, which are explained below under the heading "Beeswax."

It has been observed that Japan wax has the peculiarity of showing a lower specific gravity and a lower melting-point when it has recently solidified after having been melted, than when some time has elapsed since solidifying. Other waxes probably possess similar peculiarities. [Italics ours, except the words *analytical values* and *characteristics.*]

In "Oils, Fats, Waxes, and their Manufactured Products," by Wright and Mitchell, at p. 622 we find the following:

Wool Wax—The name "wool wax" is applied by *Lewkowitsch* to the neutral portion of wool fat. It has also been used to describe commercial products con-sisting of the more solid portions separated by treatment of the crude fat with various solvents.

Thus *Jaffé* and *Darmstaedter* (Eng. Pat. No. 14,114, 1892) treat the wool fat with fusel oil, chill the solution below the melting point of the fat, and separate the harder portion (wool wax) that deposits.

The trial court, citing the *Hummel Chemical Co.* case, *supra*, stated:

* * *. The commodity in question is rather the result of a chemical process applied to a substance known as lanolin which is a wool grease. And wool grease is not a wax. * * *.

It is our view that the processes applied produced a wax, and we so hold.

The Government has argued that the provision for wax is less specific than the esters provision. We are in disagreement with this view. The trial court did not find it necessary to decide this issue because it held that the importation was not a wax. The provision for "esters of all kinds not specially provided for" implies that some esters may be elsewhere specially provided for, and esters of all kinds, according to the admitted facts in this case, includes thousands and possibly tens of thousands of articles; while the animal waxes are few in number. One of the witnesses stated that they did not exceed ten

or twenty in number. The authorities, so far as we have been able to learn, have not mentioned more than three or four. It is our view that the provision of paragraph 1796 as applied to the instant merchandise is more specific than the provision of paragraph 37.

The merchandise is not a manufacture of wax such as provided for in the claimed paragraph 1536 for the reason that the article has not been processed further than to make it a wax. The wax has not been further manufactured.

It would seem to follow from what has heretofore been said that since the imported merchandise is a wax advanced to where it is no longer a grease, it is not described in section 701 (8) of the Revenue Act of 1936 either as "inedible animal greases" or "fatty acids derived from any of the foregoing." It is the contention of the Government that it is one "of the foregoing" which has been "otherwise processed." It is conceded that it has not been sulphonated, sulphated, or hydrogenated. The trial court stated that which cannot be denied—that it is the result of a chemical process. This process amounts to more than a refining.

The testimony is clear in the instant record, and we feel bound by it, that the process of esterification is wholly different and produces a wholly different product from a mere refining, sulphonating, sulphating, or hydrogenating. Those terms are defined in Webster's New International Dictionary, 1932, as follows:

> *refine* 1. To become pure; to be or become cleared of impure or feculent matter.
> *sulphonate—Chem.* To introduce the sulphonic group into; to convert into a sulphonic acid.
> *sulphate* 1. To treat or impregnate with sulphuric acid or a sulphate; to convert into sulphate.
> *hydrogenate.* To combine with hydrogen; to treat with, or expose to, hydrogen; to reduce * * *.
> *esterify—Chem.* To convert, or be converted, into an ester.
> *ester* * * * *Chem.* A compound which may be regarded as formed by the replacement of the acid hydrogen of an acid, organic or inorganic, by a hydrocarbon radical;—called also *compound ether, ethereal salt.* When the radical is not specified in the name, *ethyl* is often understood; as, acetic *ester,* or ethyl acetate. Many esters are liquids, often of agreeable odor. The natural fats are glyceryl esters of the fatty acids, oleic, stearic, etc. Esters are analogous in structure to salts, but, unlike salts, are only very slightly ionized in solution, and hence react much more slowly. When hydrolyzed they yield the corresponding acid and an alcohol.

The instant merchandise is more than an animal grease or fatty acid derived from it which has been refined, sulphonated, sulphated, hydrogenated, or otherwise processed. In determining the meaning of the term "otherwise processed," we must look to the kind of processes referred to in the provision, and we find that the processes above enumerated, through which the instant merchandise passed, are wholly different from those specifically named in the provision in

controversy. It is our conclusion that the things named under the provision for "inedible animal greases" or "fatty acids derived from" the same, must still remain, after processing, greases or fatty acids.

The Government, in its contentions on the first issue heretofore decided, took the position that the instant merchandise was an ester. The trial court stated that it was the "glyceryl ester of wool-fat acids." It would seem to follow that if the instant merchandise is an ester made by the esterification of lanolin, which is commercially referred to as a wool grease, it is something more than an inedible animal grease or fatty acid derived therefrom which has merely been processed within the meaning of section 701 (8) of the Revenue Act of 1936. An ester produced by the processes above described from fatty acids, which are derived from animal greases, cannot be regarded as still being either a grease or a fatty acid; and, having found the material to be a wax, we must conclude that it is more than a grease or a fatty acid, processed, and that therefore it is not subject to the tax provided by the section in controversy.

It follows from the foregoing that the claims of appellant's protest that the instant merchandise is free of duty as an animal wax under paragraph 1796 and that it is not subject to the internal revenue tax should have been sustained. The judgment of the United States Customs Court is *reversed*.